**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 13-6792**

---

UNITED STATES OF AMERICA,

　　　　　　Petitioner – Appellee,

　　　v.

RANDLE PORTER COOKE,

　　　　　　Respondent – Appellant.

---

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Louise W. Flanagan, District Judge. (5:09-hc-02034-FL-JG)

---

Argued: March 18, 2014　　　　　　Decided: April 7, 2014

---

Before TRAXLER, Chief Judge, DUNCAN, Circuit Judge, and DAVIS, Senior Circuit Judge.

---

Affirmed by unpublished per curiam opinion.  Senior Judge Davis wrote a separate opinion concurring in the judgment.

---

**ARGUED:** James B. Craven, III, Durham, North Carolina, for Appellant.  Matthew Fesak, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:** Thomas G. Walker, United States Attorney, R.A. Renfer, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIUM:

On this appeal, Randle Porter Cooke challenges his designation as a sexually dangerous person and consequent civil commitment under the Adam Walsh Child Protection and Safety Act of 2006, 18 U.S.C. § 4248. For the reasons that follow, we affirm.

I.

Cooke has been convicted and imprisoned three times as a result of sexual contact with minors. In 1981, Cooke was charged with aggravated sexual assault for fondling a boy under the age of 13. He pleaded guilty to an attempted felony, for which he received a suspended two-year sentence.

In 1991, Cooke was convicted in Texas state court of sexual assault of a child and indecency with a child. The first of these charges related to his performing oral sex on and touching the genitals of a fourteen-year-old boy. The second related to his touching the genitals of another boy under the age of 17. He was sentenced to 10 years' imprisonment and was released in November of 2000.

The events leading to Cooke's most recent incarceration began seven months later. In May of 2001, he met a twelve-year-old boy in a bookstore. Cooke told the boy and the boy's mother that he was a "big brother" who mentored young people. Cooke

2

began communicating with the boy by email and was allowed to take him on an outing. He drove the boy to a cemetery and, en route, Cooke attempted to hypnotize the boy and placed his hand on the boy's penis. At the cemetery, Cooke gave the boy marijuana and asked him to engage in oral sex. The boy declined.

Cooke took the boy home, but continued to try to contact him until October of 2001. To avoid detection by the boy's parents, Cooke asked the boy to refer to him as though he were a 15-year-old boy named "Josh," and wrote the boy letters under that name. Cooke also contacted one of the boy's schoolmates online, again posing as a boy named "Josh," in an attempt to set up a meeting.

In October of 2001, Federal Bureau of Investigation agents interviewed Cooke. He told the officers that he was initially sexually attracted to the boy and had hoped to have a sexual relationship. He claimed, however, to have since regained control over his sexual urges. Cooke permitted the FBI to search his computer where investigators found more than 100 photographs of teenaged males between the ages of 11 and 20 engaged in sexual conduct and one photograph of a 9-year-old boy posed provocatively with his underwear exposed.

As a result, Cooke was charged with and pleaded guilty to one count of possession of child pornography in violation of 18

3

U.S.C. § 2252(a)(4)(B) and two counts of receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2). He was sentenced to 87 months' imprisonment and three years' supervised release.

Prior to Cooke's 2010 release date, the Attorney General filed a certification in the Eastern District of North Carolina that Cooke is a sexually dangerous person.[1] This filing automatically stayed Cooke's release from prison and initiated commitment proceedings.

During those proceedings, an evidentiary hearing was held before a magistrate judge to determine Cooke's status as a sexually dangerous person. Cooke and two experts testified on his behalf and three experts testified for the government.

The government also introduced instances of Cooke's misconduct in prison. For example, Cooke sought to have himself placed in protective custody by presenting prison officials with what purported to be a threatening note. It was later discovered that Cooke had written the note himself. On another occasion, Cooke developed a relationship with a 22-year-old

---

[1] Though Cooke was convicted of the underlying offenses in the Western District of Tennessee, he was in custody within the Eastern District of North Carolina at the time the certification was filed. The Adam Walsh Act provides that the certification is to be filed, and commitment proceedings conducted, in the district within which the respondent is incarcerated, not the district in which he was convicted. 18 U.S.C. § 4248(a).

fellow inmate, with whom he tried to secure private time in the prison chapel. This inmate was a mental health patient with his own history of sexual offenses. Discussing his fondness for this inmate, Cooke confided in a prison official that he liked "young, troubled boys."

Cooke was transferred to FCI Butner where he sought to participate in the the Sex Offender Treatment Program, but was initially denied access because his release date was too distant. When he became eligible for the program, however, Cooke declined to participate because statements made in the program could be used against him in proceedings such as this.

Cooke testified that he would gladly participate in treatment, but his plans for doing so were vague. Cooke's only specific post-release plan to avoid relapse was to live at the same assisted living facility as his mother. His plan indicated his desire to live peacefully, have long-postponed surgery, seek therapy, and generally avoid returning to his former habits. It did not indicate the development of any special knowledge or skills to help him avoid situations or stimuli that might lead him to reoffend. To the contrary, the government introduced correspondence between Cooke and another convicted sex offender exchanged in late 2011 and early 2012.

Two forensic psychologists, Dr. Gary Zinik and Dr. Lela Demby, testified as expert witnesses for the government on

5

direct. Dr. Zinik diagnosed Cooke with "Paraphilia NOS, Hebephilia, attracted to Adolescent Males, Nonexclusive Type,"[2] "Cannabis Dependence by history, in remission in a controlled environment," "Narcotics Dependence (pain medication), in remission in a controlled environment," and "Personality Disorder NOS, with Antisocial and Narcissistic Features." J.A. 725. Dr. Zinik concluded that there was a "high level" of risk that Cooke would reoffend, despite the fact that Cooke is paralyzed from the waist down and is often catheterized. Dr. Zinik noted that Cooke was similarly impaired at the time of most of his previous offenses.

Dr. Zinik observed that Cooke's "predatory" advances towards a vulnerable fellow inmate belies Cooke's claims that he has changed his behavior. J.A. 724. Cooke's "vague, evasive" responses to questions about his past offenses suggest that Cooke does not really "get" his condition and that he "*thinks* and *talks* like an untreated sex offender." Id. Dr. Zinik concluded that "Mr. Cooke is still at least a medium-high to high risk for sexual reoffense" and that he remains "physically capable of molesting young boys in the same fashion as he has in the past if he were motivated to do so." J.A. 728.

---

[2] "NOS" is an abbreviation for "not otherwise specified."

6

Dr. Demby similarly concluded that "it is highly likely that Mr. Cooke will continue to sexually reoffend." J.A. 759. She diagnosed Cooke with "Paraphilia Not Otherwise Specified," "Narcotic Dependence in a Controlled Environment (by history)," and "Personality Disorder Not Otherwise Specified with borderline Traits." J.A. 752. She further opined that Cooke's physical condition would not impede him from reoffending, noting as Dr. Zinik did, that Cooke has offended repeatedly in his current condition. In fact, Dr. Demby observed that "[Cooke's] disability appears to serve as part of his ability to get parents and victims to trust him." Id. Also like Dr. Zinik, Dr. Demby concluded that Cooke "demonstrates extreme minimization and denial of his offenses, as well as attitudes that support his sex offenses. Both of these factors exacerbate his risk of reoffense." J.A. 758.

Dr. Joseph Plaud, a psychiatric expert, testified on Cooke's behalf. Dr. Plaud testified that Cooke's evident attraction to young pubescent boys did not constitute a diagnosable mental illness. He also criticized the predictive models used by Dr. Zinik and Dr. Demby, contending that there is no model that could reliably determine Cooke's risk of reoffending given his physical condition.

Dr. Moira Artigues also testified on Cooke's behalf, recounting his painful and debilitating conditions and opining

7

that these conditions had worsened while he was in custody. Although these impairments reduced the risk that Cooke would reoffend, Dr. Artigues did not testify that Cooke presented a "low risk" of reoffense. She did not physically examine Cooke and did not have the opportunity to review all of Cooke's most recent medical records. Her testimony was largely based on Cooke's own statements and the other expert reports.

Finally, Dr. Roscoe Ramsey, Cooke's treating physician at FCI Butner, testified for the government on rebuttal. Dr. Ramsey testified that Cooke's physical condition had not deteriorated during his last three years of detention.

The magistrate judge recommended that "the court enter an order finding by clear and convincing evidence that respondent is a sexually dangerous person within the meaning of 18 U.S.C. § 4247(a)(5) and committing him to the custody and care of the Attorney General pursuant to 18 U.S.C. § 4248(d)." J.A. 598. On de novo review, the district court agreed. J.A. 653-73.

## II.

18 U.S.C. § 4248 provides for the civil commitment of individuals in the custody of the Federal Bureau of Prisons following the expiration of their prison sentences if the government can prove, by clear and convincing evidence, that they are "sexually dangerous." To establish this, the

8

government must show that an individual "has engaged or attempted to engage in sexually violent conduct or child molestation," 18 U.S.C. § 4247(a)(5); that he "suffers from a serious mental illness, abnormality, or disorder," 18 U.S.C. § 4247(a)(6); and that, as a result, he "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." Id. See also United States v. Hall, 664 F.3d 456, 458 (4th Cir. 2012). Cooke concedes the first prong. He maintains, however, that the government failed to prove, and the district court erred in finding, that he satisfies the latter two.[3]

The district court's determinations that Cooke presently suffers from a serious mental illness and that he "would have serious difficulty in refraining from sexually violent conduct or child molestation if released" are factual determinations, which we review for clear error. See United States v. Wooden, 693 F.3d 440, 451 (4th Cir. 2012); Hall, 664 F.3d at 462. We therefore may not disturb the district court's conclusions on these points "simply because we would have decided the case

_____

[3] Cooke also argues that the Adam Walsh Act violates his right to equal protection under the Fifth Amendment because it treats Bureau of Prisons detainees differently from all other federal detainees. He acknowledges, however, that we have already considered and rejected this argument, see United States v. Timms, 664 F.3d 436, 449 (4th Cir. 2012), and we do not consider it further.

differently." Easley v. Cromartie, 532 U.S. 234, 242 (2001). Rather, we may do so only when, "'on the entire evidence' the Court is 'left with the definite and firm conviction that a mistake has been committed.'" Id. (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. Bessemer City, 470 U.S. 564, 573–74 (1985). Applying this standard, we are unable to conclude that the district court clearly erred in either of its challenged findings.

A.

We turn first to the district court's finding that Cooke presently "suffers from a serious mental illness, abnormality, or disorder." 18 U.S.C. § 4247(a)(6). We find the district court's conclusion amply supported by the record developed at the evidentiary hearing.

Of the three experts who testified about whether Cooke suffers from a serious mental disorder, two concluded that he did: Dr. Zinik and Dr. Demby diagnosed him with both Personality disorder and Paraphilia NOS, which they characterized as serious, relating to his inability to refrain from sexual

10

contact with pubescent boys. Dr. Plaud disagreed with these diagnoses, but primarily on the basis that the paraphilia with which Dr. Zinik and Dr. Demby diagnosed Cooke--hebephilia--was not a diagnosable mental disorder and was not included in the current version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM").

As most, however, this indicates a conflict in the experts' testimony, the district court's resolution of which we are "especially reluctant to set aside." Hall, 664 F.3d at 462 (quoting Hendricks v. Central Reserve Life Ins. Co., 39 F.3d 507, 513 (4th Cir. 1994)). In the absence of any other indication that Dr. Plaud's testimony should have been credited over Dr. Zinik's and Dr. Demby's, we decline to do so.

In a similar context, we have also cautioned against overreliance on the availability of a formal label:

> [O]ne will search § 4247(a)(6) in vain for any language purporting to confine the universe of qualifying mental impairments within clinical or pedagogical parameters. The statute could have been drafted to comport with clinical norms, but inasmuch as Congress chose not to do so, it has been left to the courts to develop the meaning of "serious mental illness, abnormality, or disorder" as a legal term of art.

United States v. Caporale, 701 F.3d 128, 136 (4th Cir. 2012). Our discussion of Dr. Plaud's views in Caporale is equally applicable here: while "Dr. Plaud's testimony cast some doubt that hebephilia may [qualify as Paraphilia NOS as listed in the

11

DSM]. . . the scope of 'illness, abnormality, or disorder' in § 4247(a)(6) is certainly broad enough to include hebephilia, by its own or any other name." Id. at 137. Here, the district court properly focused not on labels, but on whether Cooke's condition--whatever it may be called, and whether or not it could form the basis of a formal psychiatric diagnosis-- substantially impairs his ability to function normally in society. It concluded that Cooke's impairment was clear, as manifested in his "long periods of incarceration, feelings of shame and humiliation, and distressed familial relationships." J.A. 664. Nothing in the record persuades us that this conclusion was erroneous.

Cooke contends that, whatever serious mental illness he may have suffered from in the past, he does not presently suffer from one as required by 18 U.S.C. § 4247(a)(6). But there was ample evidence to suggest that Cooke's condition persists. While Cooke testified that he no longer experiences the urge to have sexual contact with pubescent males, there was substantial evidence in the record to suggest otherwise. Both Dr. Zinik and Dr. Demby both spoke directly to this point, testifying that Cooke remains in the grip of his illness. The district court noted that hebephilia is a persistent condition as evidenced both by expert testimony and Cooke's own history of repeated reoffense. Cooke's failure to undergo treatment, and his

12

continued communication with another sex offender, similarly undermine Cooke's contention that he has taken control of his own behavior through self help.

B.

Cooke also objects to the district court's conclusion that he "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). This inquiry focuses on "the extent to which the inmate is controlled by the illness." Wooden, 693 F.3d at 460. On this prong as well, the district court's conclusion is adequately supported by the evidence.

The district court properly observed that Cooke has a long history of child molestation that, in itself, demonstrates occasions on which Cooke was controlled by his illness, and with tragic results. "When the question is whether an inmate . . . will have serious difficulty refraining from re-offending if released, consideration of the nature of his prior crimes provides a critical part of the answer." Wooden, 693 F.3d at 458. While Cooke was evidently able to control his behavior during his most recent time in prison, the same could be said of his prior incarceration in Texas state prison after which Cooke reoffended within months. Moreover, as the district court observed, Cooke had no access to pubescent males while he was incarcerated. It is therefore difficult to say with certainty

13

whether Cooke was able to control his own behavior, or whether the prison environment controlled it for him. In this context, we cannot conclude that the district court erred in considering Cooke's interactions with a "young, troubled" fellow inmate, even if there was nothing inherently inappropriate about their relationship.

Cooke's own testimony also indicated to the district court that he was not prepared to accept responsibility for his past actions. The district court observed that Cooke's responses to questions typically minimized his own responsibility, suggesting that he "fails to appreciate the seriousness of his hebephilia and the extent to which it controls his offending." J.A. 669. Such a judgment about a witness's demeanor on the stand is another textbook example of a determination to which we owe particular deference. See United States v. McGee, 736 F.3d 263, 270 (4th Cir. 2013). Dr. Zinik and Dr. Demby corroborated this observation.

The district court discussed Cooke's relapse-prevention plan as well. The district court noted Dr. Zinik's testimony that such a plan could be valuable in "identifying triggers of sexual offending and effective prevention measures to serve as a resource for both respondent and his support group." J.A. 661. Measured against this standard, Cooke's plan--which consists of nothing more than his intended living arrangements and the

14

generalized aspiration to seek treatment and avoid reoffense--falls well short.  This suggested to the district court, not unreasonably, that "respondent does not appear to comprehend the risk of reoffense he faces in the community upon release, as opposed to in BOP custody where he has no access to pubescent males."  Id.

The district court drew a similar inference from the fact that Cooke has not participated in the sex offender treatment program available at FCI Butner since it became available to him.  Cooke maintains that he had good grounds for not doing so, and that may be.  An Adam Walsh Act detainee is not obliged to participate in such a program to secure his release.  But treatment programs teach skills to help an individual avoid reoffending, and the failure to obtain or develop such a skill set is a relevant consideration in determining the likelihood of a relapse.[4]

Finally, in view of the fact that every one of Cooke's offenses were committed while he was paralyzed from the waist down and confined to a wheelchair, the district court reasonably concluded that Cooke's many physical impairments did not

---

[4] Cooke maintains that he has managed to teach these skills to himself.  As we discuss above, however, the district court had ample grounds to disbelieve this testimony, given the contrary testimony of the government's expert witnesses and its own assessment of Cooke's credibility on the stand.

15

substantially reduce his risk of reoffense.  Even Dr. Artigues testified that Cooke's physical impairments merely reduce that risk; she did not say to what extent.

## III.

For the foregoing reasons, the district court's order committing Cooke to the custody of the Attorney General is

AFFIRMED.

DAVIS, Senior Circuit Judge, concurring in the judgment:

This is a close case. Ultimately, I vote to affirm because evidence of Cooke's recent history and his own testimony meaningfully contribute to the satisfaction of the Government's burden to establish by clear and convincing evidence that he still suffers from a volitional impairment that makes his likelihood of reoffending higher than that of the typical recidivist. His case is therefore distinguishable from United States v. Antone, 742 F.3d 151 (4th Cir. 2014), in which we held that the district court's finding regarding volitional impairment was not supported by clear and convincing evidence because, among other reasons, it ignored the offender's recent history while assigning determinative weight to the existence of his prior offenses.

This case, and these cases generally, are evaluated through three prisms. First, the Adam Walsh Act is designed to target individuals who are different from the rest of the offender population. The policy choices Congress has made is rooted in the perception that there are unique mental health issues associated with these sexual offenders that create a much higher likelihood of recidivism. Antone, 742 F.3d at 159; United States v. Timms, 664 F.3d 436, 449 (4th Cir. 2012) (holding that Congress' rational interest was to protect the public from "reasonably foreseeable harm" by ex-convicts). Cf. Kansas v.

17

_Crane_, 534 U.S. 407, 413 (2002). Second, the evidentiary standard in these cases is "exacting": there must be clear and convincing evidence that an individual is so impaired that he is likely to commit a future sexual offense. _Antone_, 742 F.3d at 159. And third, this standard is a tough one to meet - and the burden is on the _Government_ to meet it.

It is important that an appellate court's reasoning take care not to shift the burden to an offender to show that he will not offend again; over-reliance on an offender's pre-incarceration history poses that risk. For example, the majority concedes that it is "difficult to say with certainty whether Cooke was able to control his own behavior, or whether the prison environment controlled it for him." Maj. op. at 14. But the point of the Walsh Act inquiry is to put in place a standard that the Government must meet with a relatively precise degree of certainty, i.e., a certainty tested by the exacting clear and convincing evidentiary standard. Similarly, the majority approvingly cites the district court's observation "that Cooke has a long history of child molestation that, in itself, demonstrates occasions on which Cooke was controlled by his illness, and with tragic results." Maj. op. at 13. But our case law forsakes this myopic focus on the past, instead highlighting that _recent_ behavior is also a particularly probative data point in these cases. _Antone_, 742 F.3d at 166.

18

Despite my concerns about the majority's approach, I agree with its ultimate conclusion because, unlike in <u>Antone</u>, Cooke's recent history strongly suggests that he suffers from a current volitional impairment. Most importantly, the district court's assessment of Cooke's testimony revealed that he was simply not a credible witness: (1) his plans for obtaining treatment were not credible; (2) his claimed willingness to take responsibility for his prior conduct was not credible; and (3) his purported understanding of the nature of his illness was not credible. At least one expert testified that his behavior was demonstrative of an untreated sex offender. These credibility determinations, combined with the lack of a concrete post-release treatment plan and the record evidence that his interest in young and troubled boys had endured, were - in the light of the totality of the factual record - sufficient for the district court find that Cooke currently suffers from a volitional impairment and would likely reoffend if not committed for treatment. The district court was amply justified in rejecting Cooke's assertion (only implied, to be sure) that if he were to reoffend upon release, it would be because he <u>chose</u> to reoffend and not because he lacked the volitional control needed to avoid doing so.

I concur in the judgment.