UNITED STATES of America,
Petitioner,

v.

Walter WOODEN, Respondent.

NO. 5:10–HC–2151–BO

United States District Court,
E.D. North Carolina,
Western Division.

11/03/2016

Filed 11/07/2016

Christina A. Kelley, Federal Bureau of Prisons, Michael E. Lockridge, Butner, NC, G. Norman Acker, III, Edward D. Gray, R. A. Renfer, Jr., United States Attorney's Office, Michael James, Raleigh, NC, for Petitioner.

Debra C. Graves, Joseph H. Craven, Sonya M. Allen, Federal Public Defender, Raleigh, NC, Debra Carroll Graves, Durham, NC, for Respondent.

## ORDER

Terrence W. Boyle, United States District Judge

This cause comes before the Court following a hearing to review the commitment of respondent, Walter Wooden, as a sexually dangerous person pursuant to the Adam Walsh Child Protection and Safety Act of 2006, 18 U.S.C. § 4248. For the reasons that follow, the Court finds that Mr. Wooden is no longer sexually dangerous and orders his release from commitment.

## BACKGROUND

On July 15, 2010 the government instituted an action pursuant to Title 18, Section 4248(a), of United States Code, seeking to commit respondent Walter Wooden as a "sexually dangerous person" under the Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act" or "the Act"). After an evidentiary hearing, this Court held first, that § 4248 violated the Equal Protection and Due Process Clauses of the United States Constitution

as applied to Mr. Wooden, and second, that the government had not satisfied its burden to show that Mr. Wooden is sexually dangerous to others as defined by the Adam Walsh Act. [DE 68].

The government appealed, and by opinion filed September 6, 2012, a panel of the Court of Appeals for the Fourth Circuit reversed the Court's judgment and remanded the matter for reconsideration. In its opinion, the Court of Appeals held that this Court erred in its conclusion that the Act as applied to Mr. Wooden violated the Due Process and Equal Protection Clauses of the United States Constitution. *United States v. Wooden*, 693 F.3d 440, 451 (4th Cir. 2012); *see also United States v. Timms*, 664 F.3d 436 (4th Cir. 2012). The court of appeals further reversed as clearly erroneous the Court's factual finding that Mr. Wooden does not suffer from a serious mental disorder and that, even if he did, he would not have serious difficulty refraining from sexually violent conduct or child molestation if released. *Wooden*, 693 F.3d at 456; 462.

Upon remand, this Court again reviewed the evidence and held that, as the court of appeals had reversed and found clearly erroneous its earlier findings of fact, the law of the case in this matter prescribed that on those issues previously found in favor of Mr. Wooden and against the government, the government prevailed. [DE 84]. The Court then detained Mr. Wooden to the custody of the Attorney General pursuant to 18 U.S.C. § 4248. Mr. Wooden appealed the Court's order, and the court of appeals vacated this Court's holding, finding that its "mandate did not require the district court on remand to find Wooden to be sexually dangerous." *United States v. Wooden*, 546 Fed.Appx. 229, 232 (4th Cir. 2013) (unpublished).

Following remand for a second time, the Court held a second hearing on March 5, 2014, at Raleigh, North Carolina. After a careful review of the record and the opinions of the court of appeals, the Court adopted the government's proposed findings of fact and conclusions of law, [DE 102], to the extent that it was not inconsistent with this Court's order entered April 9, 2014. [DE 106]. In the order, which was limited to the record as it existed at the 2011 hearing, the Court concluded that Mr. Wooden was indeed a sexually dangerous person under the Adam Walsh Act and ordered him civilly committed. *Id.*

On March 22, 2016, Mr. Wooden moved for a hearing pursuant to 18 U.S.C. § 4247(h) to challenge his continued commitment under the Act. [DE 120]. Mr. Wooden contends that there are essentially four reasons he should be discharged from civil commitment: (1) Dr. Winsmann's conclusion, to a reasonable degree of psychological certainty, that Mr. Wooden is not a sexually dangerous person; (2) Mr. Wooden's development of certain medical conditions that have debilitated him to the point that he is not a sexually dangerous person, notwithstanding his prior diagnoses; (3) Mr. Wooden's age at 60 which reduces his risk of reoffending significantly despite his prior diagnosis of pedophilia; and, in the alternative, (4) Mr. Wooden's release plan which will provide conditions under which Mr. Wooden would not be sexually dangerous if released to the community. *Id.* The Court granted Mr. Wooden's request, and a review hearing was conducted before the undersigned on September 28 and 29, 2016, at Elizabeth City, North Carolina. The Court considered the testimony of the following individuals:

*Mr. Walter Wooden*

Mr. Wooden testified on his own behalf at the hearing. During his testimony, Mr. Wooden expressed regret for his actions, stating that he "took advantage of them little kids" and that it was not the right

thing to do. [DE 150 at 26]. He stated that he refuses to participate in sex treatment at Butner because he does not want to be around people who only think about "having sex with each other 24 hours a day" and that he's "trying to get away from all that." [DE 150 at 31]. He does not deny his past crimes, and he testified that he is no longer attracted to young boys. [DE 150 at 33]. He stated that he "trying to stay far away from that" and that he is attracted to women. [DE 150 at 33]. Mr. Wooden also testified that he suffers from diabetes, asthma, arthritis, and fractured shoulders and stated that he has had five surgeries on his legs, including a surgery in which two of his toes were removed. [DE 150 at 34]. He also suffers from constant pain and digestive issues. [DE 150 at 34–35]. He has been using a wheelchair for about a year, although he tries to work his legs when he can. [DE 150 at 36]. He stated that he plans on living with his sister, Rosia Simms, if released. [DE 150 at 38]. Finally, when asked if plans on having sex with children again, Mr. Wooden stated: "I'm not going to put myself in no situations like that no more, never. I'm not going to do it." [DE 150 at 39].

### Dr. Joseph Plaud

The Court next considered Dr. Plaud's testimony and the formal reports of his psychological evaluation of Mr. Wooden. Dr. Plaud performed an evaluation of Mr. Wooden in the summer of 2014, and, as a result, noted significant concerns over Mr. Wooden's neurocognitive development. [DE 151 at 15]. He recommended that Mr. Wooden be further evaluated with standardized neuropsychological and intellectual testing. [DE 151 at 16]. After reviewing the report of Dr. Winsmann who performed that requested testing, Dr. Plaud issued an amended report in which he concluded that Mr. Wooden is no longer sexually dangerous. Resp't Ex. 6 at 2. Specifically, Dr. Plaud concluded that Mr. Wooden's:

historical intellectual and social deficits, as well as negative mood states, and other interpersonal deficits may have played a significant role in the genesis of his own delayed and at times problematic and illegal sexual functioning and behavior when he was a younger man. When specific analysis is given to Mr. Wooden's sexual volitional control at this time—which is the critical issue in this case—it is my professional judgment that his risk level is substantially reduced by a number of dynamic factors: his involvement thus far with the criminal justice system, the consequences he has received over many years in his civil commitment, his ongoing psychological maturation as a man who is now 60 years old. In reviewing his current intellectual and psychosocial functioning, it is my professional judgment that his current risk level does not comport itself to the standard that he would at this time have serious difficulty in refraining from sexually violent conduct or child molestation if released.

*Id.* In his testimony, Dr. Plaud explained that while he initially diagnosed Mr. Wooden with historical Pedophilic Disorder, this diagnosis was based on historical data and stated further that "there's really no evidence in the better part, in the last 10 years that Mr. Wooden, as he sits at Butner, has recurrent or intense sexually arousing fantasies, urges, or behavior involving sexual activity with prepubescent males. There's nothing." [DE 151 at 18–19]. In his amended report Dr. Plaud did not withdraw his initial diagnosis of Paraphilic Disorder by history, due in part to his understanding that the criteria of the Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") does not allow for remission of Pedophilic Disorder. [DE 151 at 35]. Dr. Plaud

further testified that, in Mr. Wooden's initial proceedings, the testifying experts "didn't have the proper diagnostic structure to understand Mr. Wooden's functioning back then." [DE 151 at 27]. Dr. Plaud agrees with Dr. Winsmann's diagnosis of Intellectual Development Disorder ("IDD") (formerly mental retardation), [DE 151 at 19], and would not diagnose Mr. Wooden with Antisocial Personality Disorder. Resp't Ex. 6 at 8. As to Mr. Wooden's explanations for his past actions, Dr. Plaud testified that they could be characterized as cognitive distortions if he was typically developed, but that "it's not that simple given Mr. Wooden's functioning level." [DE 151 at 37]. As to Mr. Wooden's credibility, Dr. Plaud stated that one "can't divorce what we now know about him and his ability to remember and express and articulate those memories the same as you would for you, I or everybody else in this courtroom. ... [I]t all has to be treated with a grain of salt to say the least." [DE 151 at 40]. Dr. Plaud believes that, now at age 60, Mr. Wooden has progressed cognitively so that he now has obtained a "fundamental understanding now of the wrongfulness of engaging in that behavior" and therefore will not face a serious difficulty in refraining from child molestation if released. [DE 151 at 26]. Dr. Plaud based his conclusion on clinical interviews with Mr. Wooden; peer-reviewed research articles on sexual offense recidivism and risk assessment; statistically-derived models of sexual offense recidivism which he applied to Mr. Wooden; a Personality Assessment Inventory; and a review of the record in this case. Resp't Ex. 6 at 6.

### Dr. Frederick Winsmann

As a result of Dr. Plaud's initial examination and the concerns he expressed as to Mr. Wooden's neurocognitive development, the defense retained Dr. Frederick Winsmann to perform a psychological evaluation of Mr. Wooden. The Court considered Dr. Winsmann's testimony as an expert witness and reviewed the formal report of his evaluation of Mr. Wooden. Dr. Winsmann based his conclusions on approximately eight hours of clinical interviews with Mr. Wooden; a review of the record in this case; a series of neuropsychological screening measures [1]; and phone interviews with two of Mr. Wooden's sisters. Resp't Ex. 2 at 3–4.

The screening measures employed by Dr. Winsmann demonstrate that Mr. Wooden suffers from Intellectual Development Disorder (formally known as mental retardation). Mr. Wooden's low scores on the Vineland–II suggest that he has struggled, and continues to struggle with, activities of daily life. Resp't Ex. 2 at 38. Mr. Wooden's performance on the Wechsler Memory Scales placed him at the Borderline (3–8 percentile) and Impaired (2 percentile and below) ranges, indicating severe memory problems and an impaired ability to participate in treatment programming. Id. at 38. The Wide–Range Achievement Tests indicate academic difficulties and that his abilities in reading, spelling, and mathematics place him at a Third or Fourth Grade level. Id. at 39. Finally, Mr. Wooden's performance on the Vocabulary Assessment Scales placed him in the 1 percentile of the population, correlating with age equivalents of 9.1 to 10.1 years of age. Id. at 40.

1. The screening measures administered by Dr. Winsmann were the Wechsler Adult Intellectual Scale 4th edition (WAIS-4), the Wide Range Achievement Test (WRAT), the Vineland–II Adaptive Functioning Scales, the Vocabulary Assessment Scale — Expressive (VAS–E), Vocabulary Assessment Scale — Receptive (VAS–R), the Wechsler Memory Scales (Logical Memory I and II), and the Mini–Mental Status Exam (MMSE). [DE 119 at 4].

Dr. Winsmann also concluded that Mr. Wooden does not meet the legal criteria to be considered a sexually dangerous person. Resp't Ex. 2 at 2. Dr. Winsmann testified that Mr. Wooden's past arousal to children appears not to be preferential, but was instead "behavior caused by a failure to discriminate, immaturity and a need for social acceptance, and underdeveloped social skills." *Id.* at 51. He wrote that "past diagnoses of a paraphilic nature were made in error." *Id.* Dr. Winsmann testified that the record shows that Mr. Wooden possesses a global sexual interest, and not a focused interest on children. [DE 150 at 79]. He also stated that any assessment of paraphilia must focus on current arousal because, much like a diagnosis of depression, 10 years later a person may no longer have that condition regardless of a historical diagnosis. [DE 150 at 79–80]. He emphasized that diagnosticians must "understand the person and not have an explanation but the best explanation of behavior." [DE 150 at 81–82]. Dr. Winsmann also testified that Mr. Wooden does not have a serious difficulty in controlling his behavior. [DE 150 at 87–88]. Dr. Winsmann believes that Mr. Wooden's past behavior was the result of an impaired ability to make decisions, but that Mr. Wooden has developed since that time. While historically Mr. Wooden showed impulsivity and less ability to weigh consequences, today Mr. Wooden does not demonstrate an impulsive personality and has demonstrated development in his ability to weigh choices and see consequences. [DE 150 at 89]. According to Dr. Winsmann, "[t]he passage of time and the periods of incarceration have had an effect: Mr. Wooden has an improved ability to make decisions and control his impulses." Resp't Ex. 2 at 52. Dr. Winsmann supported this conclusion by citing several dynamic risk factors which are present: Mr. Wooden's age, his infirmity, and a plan to be released into the care of his sister and brother-in-law.

*Dr. Heather Ross*

The Court considered Dr. Ross's testimony as an expert witness and reviewed the formal report of her psychological evaluation of Mr. Wooden. Dr. Ross performed an annual review on behalf of the Bureau of Prisons in order to determine whether Mr. Wooden remains a sexually dangerous person. Dr. Ross reviewed Mr. Wooden's medical and criminal history, his Commitment and Treatment Program (CTP) files, and monitored telephone calls. Pet'r Ex. 3 at 2. Mr. Wooden's medical records indicate that he has current diagnoses of asthma, diabetes mellitus type II, polyneuropathy in diabetes, proliferative diabetic retinopathy, sickle cell trait, anemia, osteomyelitis, edema, and abdominal pain. *Id.* at 3. Dr. Ross employed the Static–99R test as a way to assess Mr. Wooden's risk of sexual recidivism. The SR–99 test scores a number of historical factors, and assigns a reduction in score for age progression, in order to calculate a level of risk for an individual based on statistical comparisons to other sample groups. Mr. Wooden scored a 5 on a scale from -3 to 12; he was assigned one point for never living with a lover for more than two years, three points for prior sexual offenses, one point for having male victims, one point for unrelated victims, one point for stranger victims, one point for prior sentencing dates, and received a three point deduction due to his age. [DE 150 at 18–21]. A score of 5 places Mr. Wooden in the moderate-high risk category for sexual re-offense, correlating to a sexual recidivism rate of 15.2% over five years among similar offenders in the routine sample group. Pet'r Ex. 3 at 4. Dr. Ross believes that Mr. Wooden warrants diagnoses of Pedophilic Disorder and Antisocial Personality Disorder, *id.* at 5, and would not

diagnose Mr. Wooden with IDD. [DE 150 at 13–15]. Due to repeated offenses, multiple violations of parole, refusal to participate in treatment, and sexual offending that continued into his fifties, Dr. Ross believes Mr. Wooden remains a sexually dangerous person. Pet'r Ex. 3 at 6–7.

### Dr. Laura Sheras

Dr. Sheras testified at the hearing on behalf of the government in regard to Mr. Wooden's ability to participate in treatment at Butner. The Court considered Dr. Sheras's testimony as an expert witness. Dr. Sheras testified as to Butner's treatment program, that it can be tailored to individuals with different intellectual capabilities, and that evaluators met with Mr. Wooden on a quarterly basis to assess his desire to participate in treatment. [DE 151 at 54]. Mr. Wooden frequently declined, and was often argumentative. *Id.*

### Dr. Hy Malinek

The Court considered Dr. Malinek's testimony as an expert witness and reviewed the formal report of his psychological evaluation of Mr. Wooden. Dr. Malinek testified on behalf of the government and concluded that Mr. Wooden remains a sexually dangerous person as defined by the Act. Pet'r Ex. 12 at 1. Dr. Malinek reviewed Mr. Wooden's records; the reports of Doctors Plaud, Winsman and Ross; and audiotape of Mr. Wooden's conversation with his sister. *Id.* at 2. He also tested Mr. Wooden with the MCMI–IV personality test, and assessed Mr. Wooden's risk of recidivism with the Static–99R and Static–2002R tests. *Id.* at 3. While he agreed with Dr. Winsmann that IDD could have played a role in Mr. Wooden's past offenses, he believes it cannot explain Mr. Wooden's "aggressive, persistent, predatory sexual conduct with prepubescent children." [DE 151 at 92]. Dr. Malinek believes Mr. Wooden is "among the most dangerous sex offenders" that he has

evaluated due to Mr. Wooden's recidivism, evidence of pedophilia, acting out while in treatment, predatory behavior, lack of interest in treatment, and evidence of defective controls and easily aroused anger. [DE 151 at 99].

### Mrs. Rosia Simms

Finally, Rosia Simms, Mr. Wooden's sister, testified at the hearing as to Mr. Wooden's release plan. She testified that she wants to care for Mr. Wooden because he is family and became that is what their mother would have wanted. [DE 150 at 52–53]. Mrs. Simms plans to register Mr. Wooden as a sex offender with the local police department, will enroll him in a sex treatment program at the nearby hospital, and desires to help her brother and maintain structure in his life. [DE 150 at 52–57].

## DISCUSSION

The Court incorporates by reference as if fully set forth herein the factual and procedural background included in its order of commitment entered on April 9, 2014. [DE 106]. The first criteria for commitment is not in dispute; at issue is whether Mr. Wooden suffers from a serious mental illness, abnormality, or disorder under the Act and whether, five years after the record was established in his original commitment proceedings, Mr. Wooden can now no longer be properly considered a person who would have serious difficulty refraining from sexual violent conduct or child molestation if released.

To order the commitment of a respondent pursuant to § 4248, a court must conclude, after an evidentiary hearing at which the government bears the burden of proof by clear and convincing evidence, that the respondent is a sexually dangerous person as defined by the Act. The government must show that (1) respondent

"has engaged in or attempted to engage in sexually violent conduct or child molestation" and (2) that respondent "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4248(d). If the Court finds that the government has satisfied its burden, the individual must be committed to a suitable facility for treatment until he is determined to no longer be sexually dangerous to others. 18 U.S.C. § 4248(d).

The companion statute under which Mr. Wooden has requested a hearing to determine whether he should be discharged from the custody of the Attorney General, 18 U.S.C. § 4247(h), is silent as to which party shall bear the burden of proof and what that burden should be. However, 18 U.S.C. § 4248(e) does provide, in its discussion of discharge hearings, that a showing must be made by a preponderance of the evidence in order to demonstrate that a respondent is entitled to release. While § 4248(e) does not allocate the burden of proof, the Court finds its inclusion of the level of burden to be demonstrated at a discharge hearing initiated by the government or the director of the facility at which a respondent is housed to be instructive as to the level of burden applicable where a respondent himself initiates review of his commitment under § 4247(h). The Fourth Circuit has also stated, in discussing the contours of a discharge hearing noting the availability of such a hearing under § 4248(e) and § 4247(h), that release must be ordered if a court finds by a preponderance of the evidence that the committed person is no longer sexually dangerous to others. *United States v. Comstock,* 627 F.3d 513, 516 (4th Cir. 2010).

The Court is further guided by the allocation and burden of proof provided by 18 U.S.C. § 4246(e), whose language is strikingly similar to that of § 4248(e). *See also United States v. Volungus,* 595 F.3d 1, 8 (1st Cir. 2010) (discussing similarities between § 4248 and § 4246). In the § 4246 context, like in § 4248, a committed person shall be granted a discharge hearing following certification by the director of the facility that the respondent no longer meets the criteria for commitment or upon motion by the respondent under § 4247(h). Like § 4248, the initial burden under § 4246 is on the government to demonstrate by clear and convincing evidence that the respondent satisfies the criteria for commitment. However, when seeking release under either the § 4246(e) or § 4247(h) after having been committed, § 4246 "places the burden on the [committee] to demonstrate by a 'preponderance of the evidence that [he/she] has recovered from his [/her] mental disease or defect to such an extent ...'" that discharge is appropriate. *United States v. Anderson,* 104 F.3d 359 *5 n.12 (4th Cir. 1996) (unpublished); *see also United States v. Burkhardt,* 5:07–HC–2125–D (Sept. 30, 2014 E.D.N.C.) (finding that § 4248 respondent had failed to establish by a preponderance of the evidence that he was not sexually dangerous following discharge hearing requested under § 4247(h)). For these reasons, the Court holds that the burden at a discharge or review hearing rests with the respondent to demonstrate, by a preponderance of the evidence, that he is no longer sexually dangerous. *See* 18 U.S.C. § 4247(h); 18 U.S.C. § 4248(e).

**1. Whether the respondent currently suffers from a serious mental illness, abnormality, or disorder.**

To meet his burden on this point, the respondent must prove by a preponderance of the evidence that he no longer

"suffers from a serious mental illness, abnormality, or disorder." 18 U.S.C. § 4248(d). Civil commitment is limited to individuals whose mental illness renders them dangerous beyond their control. *United States v. Francis*, 686 F.3d 265, 275 (4th Cir. 2012). The determination of whether an individual's mental illness rises to the level of a sexually dangerous person is fact specific as viewed by expert psychiatrists and psychologists. *Id.*

Although the phrase "serious mental illness, abnormality, or disorder" is not specifically defined, the Fourth Circuit has instructed that labeling a respondent with a "diagnosis" is merely a starting point and that "the true thrust of the § 4247(a)(6) inquiry [is] whether, on a case-specific basis, the respondent's underlying condition constitutes a serious functional impairment." *United States v. Caporale*, 701 F.3d 128, 137 n.4 (4th Cir. 2012). The Court in *Caporale* further noted that "a mental disorder or defect need not necessarily be one so identified in the DSM in order to meet the statutory requirement," 701 F.3d at 136 (citing *United States v. Carta*, 592 F.3d 34, 39–40 (1st Cir. 2010)).

Here, there was disagreement among the experts as to the psychological condition of Mr. Wooden. Dr. Winsmann diagnosed Mr. Wooden with Intellectual Development Disorder and did not diagnose him with Pedophilic Disorder. Dr. Plaud agreed with the diagnosis of IDD and would diagnose Mr. Wooden with Pedophilic Disorder by history, but stated that Mr. Wooden does not meet the criteria for a current diagnosis. Dr. Malinek did not disagree with a Dr. Winsmann's assessment of IDD, but asserted that Mr. Wooden's past behaviors could only be explained by Pedophilic Disorder which he, along with Dr. Ross, believe Mr. Wooden continues to suffer from.

In light of the record evidence, and in the course of observing Mr. Wooden for a period of over five years, the Court highly credits the testimony and conclusions of Dr. Winsmann and Dr. Plaud that Mr. Wooden has suffered from Intellectual Development Disorder throughout the duration of his life and that IDD is a better explanation for Mr. Wooden's past criminal behavior than Pedophilic Disorder.

The Court heeds the testimony of Dr. Malinek that individuals with IDD usually do not commit sexual crimes but are instead often the victims of sexual assault. The Court also considered Dr. Malinek's testimony that persons can, and often do, suffer from multiple disorders and that, in his opinion, IDD cannot be the sole explanation for all of Mr. Wooden's past behavior because there is nothing in IDD that compels deviant sexual attraction to children.

While it is undisputed that Mr. Wooden has molested children and exhibited strong sexual interests toward prepubescent, male children, there is also evidence demonstrating that Mr. Wooden has exhibited sexual attraction toward adult women and has had adult, age-appropriate partners. The Court finds compelling both Dr. Winsmann and Dr. Plaud's explanation for Mr. Wooden's past behavior as being a result of serious intellectual delay such that Mr. Wooden experienced the physical and hormonal development of a teenager and young adult but the cognitive development and maturity of a much younger person, as much as 10 or 15 years behind, and was therefore unable to understand or control his sexual urges. [DE 151 at 25–26].[2]

---

**2.** Dr. Winsmann testified extensively regarding this issue. [DE 150 at 83] ("Well, I don't see the focused interest on children. I see a global interest in many different ages in his sexual interest. And I also see these real adaptive difficulties that drive someone like

Whereas Doctors Ross and Malinek ascribe Mr. Wooden's past sexual misconduct to an uncontrollable sexual attraction to prepubescent male children, Doctors Plaud and Winsmann conclude that the record evidence is indicative of a global sexual interest, which when coupled with adaptive difficulties and an impaired emotional and cognitive development, led to deviations from acceptable conduct and an inability to weigh consequences with the maturity of a developed person of his physical age. Essentially, due to his IDD or mental handicap, Mr. Wooden lacked the cognitive functioning and emotional maturity to form healthy relationships, control or understand his sexual urges, or discriminate between partners his own age and children with whom he more easily bonded emotionally. Mr. Wooden himself has exhibited these characteristics as the Court has observed him over the course of five years. The Court finds that this reasoning is compelling and that the record evidence supports this conclusion.

Mr. Wooden himself has testified that he is not currently attracted to male children, is attracted to women, and that he understands the wrongfulness of his past actions. He stated to evaluators that "[he] came to grow up and see that's not what [he] wants." Resp't Ex. 2 at 27. Mr. Wooden has spoken frequently throughout his

adult life, to various evaluators and authorities, of his intense attraction to adult females. The Court credits Dr. Winsmann's testimony that statements like these and others noted in his evaluation are not indicative of a preferential deviant sexual urge toward children and finds Mr. Wooden's testimony on this issue to be credible.

Additionally, the Court notes that the DSM–5 requires arousal over a six month period to diagnose an individual with a paraphilia and that no such period of arousal has been shown in recent years.[3] While the evidence demonstrates that such a diagnosis could have been supported in the past, there is a genuine scientific dispute as to whether historical incidents of deviant sexual arousal should support a present day diagnosis.[4] The DSM–5 allows for no possibility of remission of Pedophilic Disorder, but previous editions of the Manual did. [DE 151 at 17].

Whether or not pedophilia is a chronic disorder, in this case the Court credits the testimony of Doctors Plaud and Winsmann that Mr. Wooden is not currently exhibiting pedophilic urges. Not only has Mr. Wooden not exhibited any pedophilic urges since 2005, but he has also testified credibly that he no longer experiences those impulses. The only evidence the government has submitted to rebut this evidence

this to really feel more comfortable around persons who are so much younger than him chronologically, but he is at really close to their age in terms of emotional and cognitive development. So when you look at these factors and the way he's functioned in the world, it's more compelling to me, it's more compelling. I considered Pedophilic Disorder. I would not be doing my job if I didn't. But it's more compelling explanation for his behavior.").

**3.** The DSM is widely recognized as "the authoritative reference used in diagnosing mental disorders." *Young v. Murphy,* 615 F.3d 59, 61 n. 1 (1st Cir. 2010). "Although the DSM's

description of pedophilia is not controlling, it is persuasive." *Wooden,* 693 F.3d at 462; *see also Kansas v. Crane,* 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002) ("[T]he science of psychiatry ... informs but does not control ultimate legal determinations ....").

**4.** Doctors Winsmann and Malinek provided disparate testimony on this issue. According to Dr. Winsmann, "[m]ental disorders are not necessarily life-long assignments as the psychic apparatus is a dynamic structure." [DE 119 at 50]. In contrast, Dr. Malinek stated that "[p]edophilia is a life-long, chronic condition ...." [DE 151 at 89].

is to cite his history of criminal behavior and that he has declined treatment, but such evidence does not demonstrate that he has experienced any sort of intense sexual arousal toward male children since 2005.

As a result, and when viewing the evidence in its entirety, the Court finds that the record in this case no longer "contains substantial evidence showing that Wooden [is] having intense and recurrent sexually arousing fantasies and sexual urges about prepubescent children . . . ." *United States v. Wooden*, 693 F.3d 440, 452 (4th Cir. 2012).

The Court also considered Dr. Malinek's testimony that Mr. Wooden merits a diagnosis of Antisocial Personality Disorder and that he exhibits narcissistic personality traits, characterized by "a persistent sense of grandiosity, self-importance, a need for admiration from others, a sense of entitlement," [DE 151 at 63], as well as his observations of Mr. Wooden's demeanor as "easily angered, as moody, as entitled, as easily provoked to anger." [DE 151 at 64]. However, as Dr. Winsmann testified, such behaviors could also be ascribed to Mr. Wooden's emotional immaturity and intellectual deficits. Pet'r Ex. 12 at 50–51. Such an explanation is persuasive and Dr. Malinek's diagnoses do not comport with the record evidence and the Court's observations of Mr. Wooden over a course of five years. As such, the Court does not credit Dr. Malinek's diagnoses because Mr. Wooden's behavior is better explained by his emotional immaturity and intellectual deficits.

Having found that Mr. Wooden's past behavior is best explained not by Pedophilic Disorder or Antisocial Personality Disorder but by his diagnosed Intellectual Development Disorder, the Court must determine whether this condition constitutes a mental illness under the Act. The Fourth Circuit has held that the phrase "serious mental illness, abnormality, or disorder" in the Act is "a legal term of art" to be developed by the courts. *Caporale*, 701 F.3d at 136; *see also Kansas v. Hendricks*, 521 U.S. 346, 359, 117 S.Ct. 2072 (explaining that "the term 'mental illness' is devoid of any talismanic significance," and instructing that legislative development of specialized "[l]egal definitions . . . need not mirror those advanced by the medical profession").

The Supreme Court in *Kansas v. Hendricks* requires that civil commitment schemes, such as the Act in operation in this proceeding, must couple proof of dangerousness with proof of a mental illness or abnormality in order to comply with Constitutional protections and so as to "limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." 521 U.S. at 358, 117 S.Ct. 2072. That is, to be civilly committable, an individual's uncontrollable and dangerous deviant behavior must be driven by that individual's mental illness.

In this case the deviant behavior that the Act seeks to protect the public from is sexually dangerous behavior. The Act requires a person to be certified as a "*sexually* dangerous person" in order to be civilly committed, 18 U.S.C. § 4248(a) (emphasis added), and the whole thrust of the Act is to confine those who are unable to control their sexual desires such that they suffer a serious functional impairment and are thereby sexually dangerous to others. Indeed, as the Fourth Circuit noted in *United States v. Hall*, the Act was enacted in order to restrain those who are unable to "refrain from acting upon [their] deviant sexual interest[s]." 664 F.3d 456, 463 (4th Cir. 2012). There must be a nexus with sexual dangerousness, and Congress could not have meant that individuals with be-

nign, non-culpable disorders are committable. Under this understanding, the Court is unable to conclude that a diagnosis of Intellectual Development Disorder, without more, has a sufficient nexus with sexually dangerous activity to support commitment under the Act. The Court therefore holds that a diagnosis of Intellectual Development Disorder, by itself, is not such a deviant mental disorder to rise to the level of a serious mental illness, abnormality, or disorder under the Act.

The Adam Walsh Act requires this Court to decide whether Mr. Wooden "currently suffers from a serious mental illness, abnormality, or disorder." 18 U.S.C. § 4248(d) (emphasis added). Because IDD, formerly known as mental retardation, is not a serious mental illness, abnormality or disorder under the Adam Walsh Act, and because a preponderance of the evidence demonstrates that Mr. Wooden does not suffer from Pedophilic Disorder at this time, the Court finds that Mr. Wooden does not currently suffer from a serious mental illness, abnormality, or disorder under the Adam Walsh Act.

### 2. Whether as a result of the illness, abnormality, or disorder, the respondent would have serious difficulty in refraining from sexually violent conduct or child molestation if released.

■ In the alternative, assuming *arguendo* that Mr. Wooden still suffers from a serious mental illness, abnormality, or disorder as defined under the Act, release from commitment is nonetheless warranted in this case because Mr. Wooden has met his burden to establish, by a preponderance of the evidence, that he will not have serious difficulty in refraining from sexually violent conduct or child molestation if released.

■ As noted by the Fourth Circuit in *United States v. Hall,*

[t]he "serious difficulty" prong of 4248's certification refers to the degree of the person's "volitional impairment," which impacts the person's ability to refrain from acting upon his deviant sexual interest. *Kansas v. Hendricks*, 521 U.S. 346, 358, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (noting that statutory requirements that couple proof of dangerousness with proof of a mental illness or abnormality "serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control"); *id.* at 357, 117 S.Ct. 2072 (noting that civil commitment statutes may "provide[ ] for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety... provided the confinement takes place pursuant to proper procedures and evidentiary standards") (internal citations omitted); *see also Kansas v. Crane*, 534 U.S. 407, 41, 122 S.Ct. 8674, 151 L.Ed.2d 856 (2002) (noting that "our cases suggest that civil commitment of dangerous sexual offenders will normally involve individuals who find it particularly difficult to control their behavior.").

664 F.3d 456, 463 (4th Cir. 2012). The Fourth Circuit has found that in weighing the serious difficulty prong, it is appropriate to consider the following factors: failures while on supervision; resistance to treatment; continued deviant thoughts; cognitive distortions; actuarial risk assessments; impulsiveness; and historical offenses. *Wooden*, 693 F.3d at 440. It should be noted, however, that this inquiry "will not be demonstrable with mathematical precision." *Kansas v. Crane*, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002). The *Wooden* court also noted that when considering "whether an inmate suffering

from pedophilia will have serious difficulty refraining from reoffending if released, consideration of the nature of his prior crimes provides a critical part of the answer" and that the frequency and nature of a respondent's prison infractions is also relevant. *Wooden*, 693 F.3d at 458.

The Court therefore must consider both static and dynamic factors, historical behaviors and present impairment, in order to adequately assess whether Mr. Wooden will have a serious difficulty in refraining from sexually deviant behavior if released. The Court cannot consider historical facts to the exclusion of present behavior because reliance on past behavior does "not allow for a respondent's subsequent growth." *United States v. Antone*, 742 F.3d 151, 169 (4th Cir. 2014) (holding an experts opinion based solely on past behavior does not satisfy the government's heightened clear and convincing evidence burden). Indeed, sole reliance on an individual's historical behavior and criminal convictions would result in a scheme in which no respondent would ever be able to meet his burden of proving that he is no longer sexually dangerous, rendering the release provision of the Act, in practical effect, meaningless. Because of this Court's "duty to give effect, if possible, to every clause and word of a statute," *United States v. Mills*, 773 F.3d 563, 574 (4th Cir. 2014), cert. denied, —— U.S. ——, 135 S.Ct. 2824, 192 L.Ed.2d 850 (2015) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955), it declines to fully credit actuarial analyses and expert witness testimony that relies solely on Mr. Wooden's past behavior to determine his current volitional impairment.

Here, a number of pieces of evidence demonstrate that Mr. Wooden is able to control himself and would not have serious difficulty in refraining from sexually violent conduct or child molestation if released.

*Psychological evaluations*

The Court highly credits the testimony and assessments of Dr. Winsmann and Dr. Plaud, both of whom concluded that Mr. Wooden has progressed cognitively and emotionally to the point that he no longer faces a serious difficulty refraining from child molestation if released. In the opinions of Doctors Plaud and Winsmann, Mr. Wooden is no longer expressing arousal to children, has developed an ability to weigh choices and understand consequences, and has shown reduced impulsivity. These, especially when weighed alongside several protective factors including his increased age, infirmity, and a release plan, show that Mr. Wooden will be able to control his behavior and reduces the risk that he will reoffend.

Dr. Winsmann also testified that although Mr. Wooden has an intellectual disorder, namely his IDD, the presence of his condition does not drive a behavioral dyscontrol problem.[5] This comports with Mr. Wooden's testimony, which though evidencing cognitive difficulties and memory issues, allayed the Court's concerns that Mr. Wooden's impairments would not "affect [his] ability to refrain from re-offending if released." *Wooden*, 693 F.3d at 460. Mr. Wooden's testimony evidenced an understanding of his actions, remorse for his conduct, and a lack of impulsivity. The Court credits such testimony based on the

---

5. As Dr. Winsmann testified, "[t]he DSM–5 makes it crystal clear, because it's been misinterpreted, that just because you have a disorder doesn't mean that there's a volitional dyscontrol problem with that disorder. So I believe he has Intellectual Developmental Disorder but I don't think it's driving a behavioral dyscontrol problem. There's just not evidence to support that." [DE 150 at 77].

Court's observations of Mr. Wooden's demeanor and testimony, from an awareness of Mr. Wooden's IDD, and because it is substantiated by other record evidence.

The Court gives little credit to the Dr. Malinek and Dr. Ross on this issue and finds their testimony to be unreliable as it pertains to Mr. Wooden's present condition. Dr. Malinek and Dr. Ross failed to fully address Mr. Wooden's ongoing volitional impairment, and instead relied too heavily upon historical criminal behavior to justify their conclusions that he is currently sexually dangerous. Dr. Ross cited only Mr. Wooden's failure to enter treatment as evidence aside from his past behavior that Mr. Wooden is sexually dangerous. Dr. Malinek did address Mr. Wooden's capacity for self-control, and stated that because Mr. Wooden has demonstrated anger issues he faces a serious difficulty refraining from sexually dangerous activity. However, Mr. Wooden's outbursts of anger while incarcerated do not dispositively show that he is unable to control his sexual conduct, and the Court is persuaded that such outbursts are better ascribed to Mr. Wooden's emotional immaturity and intellectual deficits rather than a lack of volitional control.

Finally, the Court does not credit Dr. Malinek's assertion that Mr. Wooden is "among the most dangerous sex offenders" that he has evaluated, because this inflated conclusion flatly contradicts the picture of Mr. Wooden as the Court finds him today: 60 years old, physically and mentally handicapped, and expressing credible regret over his past actions.

*Recent problematic behavior or continued sexually deviant thoughts*

The record does not contain evidence of serious problematic behavior by Mr. Wooden while in prison and there is no evidence that he continues to manifest sexually deviant thoughts. The record in fact demonstrates sharply declining rates of in-subordinate behavior and disciplinary citations and that he has had no citations for possession of child pornography or possession of materials of a sexual nature during his commitment at Butner. This is evidence of an increasing amount of self-control and weighs toward a finding that Mr. Wooden will not face a serious difficulty refraining from sexual misconduct.

The Court notes that Mr. Wooden was previously in prison without incidents of sexually deviant behavior and then quickly recommitted acts of sexual deviancy upon subsequent release and while on parole. The Court also notes that not every individual diagnosed with a paraphilic disorder will manifest sexually deviant actions while imprisoned, and that Mr. Wooden never had a history of collecting child pornography or writing stories while in prison as other inmates have done. Thus, while this evidence—and especially the evidence of decreasing amounts of disciplinary actions while incarcerated—weighs in favor of Mr. Wooden, it is not determinative evidence of his self-control.

*Past criminal behavior*

The Court must seriously weigh Mr. Wooden's extensive history of criminal behavior and deviant sexual conduct. Most recently, in 2005 Mr. Wooden's parole was revoked after Mr. Wooden admitted in therapy to removing his pants in front of a seven year old boy and touching the boy with his penis while they were alone in an apartment building laundry room. Mr. Wooden revealed this to his therapist, Dr. Weiner, roughly 9 or 10 months after it occurred. Mr. Wooden later stated that he was not sure whether it had been a dream or not, and that he told Dr. Weiner about it because he was afraid of the possibility that he had hurt the boy. The adolescent reported that no sexual activity had occurred. At the time of this incident, Mr. Wooden was in active sex treatment and

making progress such that Dr. Weiner was in the process of discharging Mr. Wooden from therapy.

The Court addresses this incident again because it is the most recent of Mr. Wooden's historical offenses and directly led to his initial commitment under the Act and in that way it is probative of whether he would have serious difficulty in refraining from such conduct again if released. While there was not enough evidence in the record to conclusively establish that the molestation did occur, this Court nonetheless previously found that the government had demonstrated with clear and convincing evidence that in 2005 and at the time of his parole revocation Mr. Wooden was still suffering from intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child. [DE 106 at 6–7]. This was also a factor weighed by the Court in finding that Mr. Wooden would have serious difficulty in refraining from sexually violent conduct or child molestation if released. [DE 106 at 8–10]. Prior to the 2004 incident, Mr. Wooden was incarcerated for two molestations occurring in 1983 when he was 27, and prior to that for molestation in 1974 when he was 18.

Finding again that the incident in 2004 was not conclusively established, Mr. Wooden's last criminal act occurred in 1983. There is no evidence demonstrating that in the 12 years since the incident in 2004 Mr. Wooden has experienced any similarly intense sexual urges toward male children. Although Mr. Wooden's criminal record "is by no means a stale or irrelevant [historical factor]," *Wooden*, 693 F.3d at 458, his past criminal behavior is outweighed by the absence of other evidence supporting an "ongoing volitional impairment." *Antone*, 742 F.3d at 168 (emphasis in original).

*Actuarial assessments*

The Court also considered actuarial models to assess Mr. Wooden's risk of reoffending. Such models score sex offenders based on the presence or absence of risk factors as referenced against the recidivism rates of released sex offenders. *See Wooden*, 693 F.3d at 448. However, as the Fourth Circuit has noted, "knowing the recidivism rate of a particular group does not mean that the individual under consideration poses the same chance of recidivism in the same time frame; his risk could be higher or lower than that of the group based upon the unique circumstances of his case." *Hall*, 664 F.3d at 464. Accordingly, experts using these risk-assessment models must also consider dynamic factors such as "the age of the particular offender, his participation in treatment, his compliance with such treatment, his history of reoffending after treatment, and his commitment to controlling his deviant behavior." *Id.* Under this direction, the Court credits conclusions based on actuarial assessments only so far as such conclusions properly incorporate both static and dynamic risk factors.

The Mr. Wooden Static–99R score placed him in the moderate-high risk category for sexual re-offense, correlating to a sexual recidivism rate of 15.2% over five years among offenders with a score of 5 in the routine sample group. [DE 130 at 4]. This is evidence of the difficulty offenders like Mr. Wooden face in controlling their behavior, but the Court weighs this statistical analysis with the understanding that it is based almost entirely on historical factors which can never change and do not account for any development in a respondent's mental health or psyche.

*Resistance to treatment*

Mr. Wooden has refused treatment at Butner. Mr. Wooden testified that it did not help him, and that he wanted to be

away from those others who "always wanted sex" and who were "having sex with each other." [DE 150 at 31]. Whether or not to credit this assertion as factually true, the Court finds that Mr. Wooden's resistance to participation in treatment at Butner, in light of his other testimony and his diagnosed intellectual deficits, does not indicate denial of his past crimes or a refusal of the value of treatment. Rather, it indicates a misunderstanding of the prison's program, a lack of support or outreach, and a desire to keep himself away from the company that he feared was engaging in behavior he wanted to put behind him. Thus, Mr. Wooden's refusal to participate in sex treatment at Butner does not weigh against him.

*Cognitive distortions*

The Fourth Circuit has held that cognitive distortions, or thinking errors by sex offenders used to justify their behavior, are an appropriate factor to consider when assessing an individual's level volitional control and the risk that they will reoffend. The government argues that Mr. Wooden's explanations of how his molestations occurred evidence his cognitive distortion, but this was not born out in Mr. Wooden's testimony:

> Government: Okay. All right. Now, you said you got in trouble when these little boys came to you, right? This is when you got out after your first period of incarceration. You got out, you're back on the street. And you testified here today that those little boys came to you for sex, isn't that correct?
>
> Wooden: They came to me for money.
>
> Government: All right. And you wanted sex with them?
>
> Wooden: Yes.
>
> Government: All right. And, now, that's -- you believe those little boys wanted to have sex with you?

> Wooden: No, I don't believe they wanted to.
>
> Government: All right. But it's their fault that they approached you?
>
> Wooden: No, it's my fault for, my fault for taking advantage of them. It ain't their fault. It's my fault for taking advantage of them.
>
> Government: But it's your belief that those little boys came to you?
>
> Wooden: Yes.

[DE 150 at 41–2]. In this exchange, Mr. Wooden is not trying to explain his "actions in a way to manage the impressions of others and in a way to make [himself] more socially palatable." *United States v. Mitchell*, 706 F.Supp.2d 1148, 1217 (D.Utah 2010). Rather, the above demonstrates an honest understanding of his motivations and that his actions victimized children. This exchange demonstrates that Mr. Wooden has gained an awareness of the wrongfulness of his actions, that he has regret for his actions, and that he understands the consequences of his past behavior. This perception of Mr. Wooden's testimony is bolstered when viewed in light of Mr. Wooden's diagnosed intellectual deficits and observable testimonial issues with memory and comprehension. The entirety of Mr. Wooden's testimony did not contain denials or justifications of his sex offenses, but rather contained several instances of acknowledgment of the wrongfulness of his actions and expressions of regret over his actions. Additionally, the Court credits the testimony of Dr. Winsmann that previous instances of cognitive distortion by Mr. Wooden were born not out of sexual deviancy but out of intellectual disability as it is supported by record evidence and the Court's own observations of Mr. Wooden. This factor weighs in favor of Mr. Wooden.

*Substance abuse*

The Court considered Mr. Wooden's substance abuse, which is a risk factor in sexual reoffending, and was a risk factor in Mr. Wooden's previous offenses. The government proffered evidence in the form of a recorded phone call between Mr. Wooden and one of his sisters in which he indicated that, if he had attended a recent wedding with his sister, he would have been drinking at the bar. Pet'r Ex. 4. This weighs against Mr. Wooden but is not weighed heavily in light of Mr. Wooden's other testimony and intellectual deficits.

*Current disability and health issues*

Mr. Wooden is in a debilitated physical condition. He currently suffers from suffers from diabetes, asthma, arthritis, and fractured shoulders, and stated that he has had five surgeries on his legs, including a surgery in which two of his toes were removed. [DE 150 at 34]. He has constant pain and digestive issues, and he has been using a wheelchair for about a year, although he tries to work his legs when he can. [DE 150 at 34–36]. These physical conditions were clearly manifested at the time of the hearing. Mr. Wooden's physical stature was frail and diminished, his testimony was marked by a shaky voice and roundabout answers with clear gaps in thinking and understanding. During one point in the hearing Mr. Wooden suffered a low-sugar diabetic issue. [DE 150 at 60].

The Court notes that Mr. Wooden's most recent incident that caused the parole revocation was for a grooming offense, and not an incident in which Mr. Wooden physically molested a child by force. It is possible that Mr. Wooden could engage in grooming behavior while bound to a wheelchair. However, considering the absence of evidence that Mr. Wooden is currently is compelled by deviant sexual urges, the entirety of his testimony that he no longer wishes to engage in sexual conduct with children, his advancing age, and manifestations of increased self-control, the Court finds it unlikely that Mr. Wooden will engage in such grooming behavior. Thus, Mr. Wooden's current physical infirmity and illness is a factor weighing heavily in his favor that he is likely to not reoffend.

*Age and release plan*

Finally, the Court considered two additional factors that weigh in favor of Mr. Wooden's petition to be released. First, Mr. Wooden recently turned 60. Male sexual drive decreases with age, which in turn sharply reduces the risk that one will commit a sex offense. Resp't Ex. 2 at 48. Accordingly, actuarial risk assessment tools appropriately incorporate increasing age as a factor in reducing the risk of recidivism, *id.* and this is an additional factor weighing heavily in favor of Mr. Wooden's petition.

Second, Mr. Wooden's release plan, while not necessary to the determination of whether he himself will face a serious difficulty controlling his behavior, is a dynamic factor that is appropriately considered as to the risk that Mr. Wooden will reoffend. The Court has considered Mr. Wooden's testimony regarding his plan to live with his sister, and finds it, along with the testimony of Mrs. Simms, to be credible. The Court also credits Dr. Winsmann's testimony that Mr. Wooden's plan to reside with his sister and brother-in-law in a disciplined environment will be conducive to Mr. Wooden's restraint and will provide a safeguard that reduces the risk of recidivism. The Court has also considered the structures of this living arrangement, including Mrs. Simms's desire to register Mr. Wooden as a sex offender with the local police department, Mrs. Simm's plan to enroll him in a sex treatment program at the nearby hospital, that the home is located in the countryside at least five miles away from an elementary

school, that no children under 18 will live at the house, and Mrs. Simms's expressed desire to help her brother and maintain structure in his life, and finds that this is a factor weighing in favor of Mr. Wooden's petition for release from confinement.

\* \* \*

In summary, Mr. Wooden has had an extensive history of sexual assaulting male children, and as a result was diagnosed in his initial commitment hearings with Pedophilic Disorder and was found, at that time, to not have sufficient volitional control over his conduct to be released from commitment. However, new evidence demonstrates that Mr. Wooden has suffered a lifelong developmental disability that was never before formally diagnosed. As a result of this Intellectual Development Disorder, formerly known as mental retardation, Mr. Wooden lacked the cognitive functioning and emotional maturity to form healthy relationships, control or understand his sexual urges, or discriminate between partners his own age and children with whom he more easily bonded emotionally. The evidence in the record demonstrates that since Mr. Wooden's initial commitment, he has developed and matured to the point where he can understand and express regret for his actions, understand the consequences of his behavior and the damage he did to his victims, and control his urges. Finally, Mr. Wooden today is a 60 year old man who suffers from multiple debilitating physical ailments, is bound to a wheelchair, and has a home with family to reside if released. For these reasons, the Court is convinced that Mr. Wooden has met his burden, by a preponderance of the evidence, to demonstrate that he is no longer a sexually dangerous person as defined by the Adam Walsh Act.

## CONCLUSION

For the foregoing reasons, judgment shall be entered in favor of the respondent, Walter Wooden, and against the petitioner, the United States of America. The government is ORDERED to release the respondent and this action is hereby DISMISSED.

SO ORDERED, this 3 day of November, 2016.